1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY DRIVER,

　　　　　Petitioner,

　　v.

ROBERT H. TRIMBLE, Acting Warden,

　　　　　Respondent.

_____/

No. C 10-2564 SI (pr)

**ORDER DENYING HABEAS PETITION AND DENYING CERTIFICATE OF APPEALABILITY**

**INTRODUCTION**

　　Anthony Driver, a prisoner of the State of California, filed this habeas action under 28 U.S.C. § 2254 to challenge his 2007 conviction in the Alameda County Superior Court. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition is denied.

**BACKGROUND**

I.　　The Crimes

　　On February 1, 2007, Driver was charged by information with one count of kidnapping (California Penal Code § 207;[1] count 1), one count of making criminal threats (§ 422; count 2); one count of inflicting corporal injury on a spouse (§ 273.5(a); count 3); and one count of assault (§ 245(a)(1); count 4).[2]  The information alleged that counts 1 and 2 included the enhancing

_____

[1] Unless otherwise specified, further statutory references are to the California Penal Code.

[2] Count 4 was dismissed on March 20, 2007.

allegation that Driver used a deadly and dangerous weapon in the commission of the crime (§ 12022(b)(1)), and that he had three prior serious felony convictions for arson (§§ 667(b)-(i), 1170.12(a)-(d), 667.5(a)(1)).  The information further alleged that Driver had been previously convicted of sale/transportation/offer to sell a controlled substance (Health & Saf. Code § 11352(a)), and sale/transportation of marijuana (id. § 11360(a)).  The trial court granted Driver's motion to bifurcate the trial on the alleged priors.

The California Court of Appeal set out the facts:

### The Trial Testimony

At trial, Mary Wright testified for the prosecution. She met appellant when she was 15. They dated for about five years and had a daughter. Nearly 30 years later, in 2002, she decided to "get back together" with appellant, so she moved to California and married him. She and appellant lived together in an apartment in Hayward with their seven or eight-year-old grandson.

By November 2005, Wright's relationship with appellant soured. Appellant "voic[ed] his frustrations" about their relationship: he said he wanted Wright to spend more time with him. He also said he wanted to have "more sex." At the end of the conversation, appellant punched Wright in the face with a closed fist and gave her a black eye. Wright moved out of the apartment the next day and took their grandson with her. After the incident, Wright maintained a "helpful relationship" with appellant, who did not work and walked with a cane. She helped him find a post office box, sell his car, obtain food, and charge his cell phone.

In July 2006, appellant confronted Wright at her job. He yelled at her to "give him his cell phone." He was "upset [and] angry" and was "yelling and cursing and wanting his phone." Wright complied. Appellant then walked over to one of Wright's co-workers "and started a verbal confrontation with him." Appellant threw his cane on the ground; then he took off his shirt and threw it to the ground. He started yelling at Wright's co-worker and said, "Stay away from my wife."

On September 1, 2006, Wright planned to meet appellant at a coffee shop and go to the social security office with him. Appellant arrived at the coffee shop almost two hours late. As Wright sat down in the front passenger seat of appellant's car, appellant said, "'I knew I would get my hands on you'" and then punched her in the face. Instead of driving to the social security office, appellant got on the freeway. While he was driving on the freeway, he used the back of his hand to punch Wright in the face "once or twice" more. With a screwdriver, he threatened Wright to try to get out of the car while it was moving and told her that he would stab her with the screwdriver if she tried to open the door. He also said, "I want you to jump out of the car, so you can get killed" and "I'll stab you with this screwdriver." He took her cell phone.

About 10 minutes later, appellant's car began to overheat, prompting him to exit the freeway. He drove to an industrial area and continued to threaten

2

Wright with the screwdriver. He tied her up using his shoelaces; then he got out of the car and added water to the radiator. Wright tried, unsuccessfully, to loosen the binds so that she could flee. After he added the water, appellant got back into the car, untied Wright, and drove to the Berkeley marina.

At the marina, appellant complained to Wright that "he lost everything" and that she "took everything away from him." Wright tried to open the passenger door to escape; in response, appellant "exploded and attacked [her]." He "continually punch[ed] [Wright] in the face"[3] and took the handle off the passenger door to prevent Wright from opening it. Then appellant drove to a store to buy cigarettes and soda for himself. Before he went into the store, he locked Wright in the trunk of the car. Appellant left the car and returned a few minutes later; he then drove to another store while Wright remained in the trunk.

Appellant eventually permitted Wright to get out of the trunk but he held her arm so she could not escape. As soon as her "feet got to the ground, [she] snatched [her] arm [away from appellant] and took off running." She ran directly to a police car and told the police officer what had happened. She was "[u]pset, frantic, screaming, [and] disheveled." Appellant was eventually arrested.

At trial, appellant denied assaulting Wright's co-worker and gave his own version of the September 2006 incident. He admitted he had prior felony convictions for arson, robbery, sale of marijuana, and sale of a controlled substance.

### Sentencing

At the sentencing hearing, defense counsel asked the court to exercise its discretion pursuant to Romero and strike appellant's prior convictions. Counsel explained that appellant's prior convictions for arson in 1987 were "a result of him actually taking responsibility and pleading." Counsel also noted that appellant had no serious or violent felonies since his 1996 conviction for arson. Counsel also contended that the case was "not the most egregious domestic violence case where someone is shot, or stabbed or injured in significant ways." Finally, counsel described appellant's physical ailments and stated that "any life sentence basically would [be] almost equivalent to a death sentence" because of appellant's age.

The court stated that it had "read and considered the probation officer's report" as well as various letters from appellant and Wright. It then denied the motion, telling appellant: "I think that your past record has shown when you get into situations where you feel that you have been wronged domestically . . . that you react violently . . . And certainly one can see that in the two arson incidents, and one can see that in the most recent incident . . . And were you released from custody, you would be a substantial danger to another such person[.]" The court expressed concern that if it granted the Romero motion, it would be reversed by the Court of Appeal because appellant did not fall outside the spirit of the Three Strikes Law. Finally, the court noted that appellant "certainly [ ] [did] not fall outside the spirit of the [T]hree [S]trikes [L]aw, given [his] substantial past record . . . and particularly having two violent strike priors and an existing kidnap finding which is also a violent felony." The court then sentenced appellant to 35 years to

---

[3] The blows caused Wright's chin, left eye, and arm to bleed; the blows left scars on her face and on her shoulder.

3

1     life in state prison.

2  Cal. Ct. App. Opinion, ¶. 4-7 (footnote renumbered).

3

4  II.    Procedural History

5         On June 29, 2007, an Alameda County jury found Driver guilty of kidnapping (count 1),

6  making criminal threats (count 2) and inflicting corporal injury on a spouse (count 3).  It also

7  found true the enhancing allegations in counts 1 and 2 that in committing these crimes Driver

8  personally used a deadly and dangerous weapon, a screwdriver.

9         On July 2, 2007, as mentioned above, Driver was sentenced under California's Three

10  Strikes Law[4] and received a longer sentence of a 35-year-to-life prison term because he was

11  found to have suffered two prior convictions for arson that counted as strikes under the Three

12  Strikes Law.

13        On March 30, 2009, Driver's conviction was affirmed by the California Court of Appeal.

14  On June 17, 2009, his petition for review was denied by the California Supreme Court.  He did

15  not seek collateral review in the state courts.

16        Driver then filed this action on May 26, 2010.  In his petition, Driver asserted two claims

17  that the court found cognizable and ordered respondent to answer: (1) that the trial court

18  erroneously denied his Batson/Wheeler[5] challenge when the Prosecutor improperly exercised

19  a peremptory challenge to an African-American prospective juror; and (2) that his 35-to-life

20  sentence amounts to cruel and unusual punishment.  He also asserted an additional claim -- that

21

22

23        [4] California's Three Strikes Law consists of two almost identical statutory schemes -- one
   adopted by initiative and the other passed by the legislature -- that allow harsher sentences for
24  defendants who are convicted of felonies and have previously been convicted of one or more
   serious or violent felonies.  See Cal. Penal Code §§  667, 1170.12.

25        [5] In People v. Wheeler, 22 Cal. 3d 258, 276-77 (1978), disapproved on another ground
   in Johnson v. California, 545 U.S. 162, 166-68 (2005), the California Supreme Court established
26  a procedure and an evidentiary burden for raising a racial discrimination claim, which are
   comparable to those later adopted in Batson v. Kentucky, 476 U.S. 79, 95-96 (1986).  Compare
27  Wheeler, 22 Cal. 3d at 280, with Batson, 476 U.S. at 96.  The Ninth Circuit has held that "a
   Wheeler motion is the procedural equivalent of a Batson challenge in California."  Paulino v.
28  Castro, 371 F.3d 1084, 1088 (2004).

4

United States District Court
For the Northern District of California

the trial court abused its discretion when it declined to strike Driver's prior convictions for sentencing purposes -- that was dismissed by this court as state law error. The court issued an order to show cause on the two cognizable issues on October 20, 2010.

Respondent filed an answer to the petition.[6] Driver filed a traverse. The case is now ready for review on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns a conviction obtained in Alameda County, which is in this district. See 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The

---

[6] Driver named Mike McDonald, former warden of High Desert State Prison, as the respondent in this action. Robert H. Trimble, the current acting warden of Pleasant Valley State Prison in Coalinga, California -- where Driver is currently incarcerated -- has been substituted as Respondent in place of Driver's prior custodian pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

United States District Court
For the Northern District of California

petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

## DISCUSSION

I.   Batson/Wheeler claim

The California Court of Appeal set out the facts relating to Driver's Batson/Wheeler claim:

### *Jury Selection*

In his jury questionnaire, R.H. stated the following: he is a 57-year-old African-American who lives alone. He has three ex-wives. He spent almost four years in the Army and worked in the Alameda County Probation Department for several years. He began working for Lockheed Martin Space Systems Company in 1979 and is now a senior manager/manufacturing engineer there. His car was stolen and his home was burglarized. His brother was arrested for breaking and entering and the police were called when his sister had a disagreement with her

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

boyfriend.  He has served on two other juries -- one for assault and another for drunk driving -- and both reached a verdict.  He also appeared in court for a traffic violation.  In response to a question about his "feelings about our criminal justice system," R.H. stated, "It is overcrowded.  There is room for improvement.  Day in [and] day out, it does pretty good.  A better defense can be waged if you are financially able."

R.H. was the 17th of 18 jurors to be questioned during voir dire.  When the prosecutor questioned R.H., he observed that R.H. had "a couple of previous relationships that ended in divorce" and asked, "[Is] there anything about those that caused [you to] have feelings that might spill over into this case?"  In response, R.H. stated, "No."  The prosecutor then questioned R.H. about his residential and employment history and his sister's domestic dispute.  R.H. stated that he did not personally observe the dispute.  The prosecutor noted that R.H. had indicated on his juror questionnaire that the criminal "system is overcrowded."  The prosecutor stated, "It's hard to argue with that."  Then the prosecutor noted that R.H. wrote on the questionnaire that there was room for improvement in the criminal justice system; the prosecutor asked, "How would you see the system improving?"  R.H. responded, "I don't have any solutions" and the prosecutor asked no further questions of him.

During defense counsel's voir dire, R.H. stated that he had served on at least two juries that reached a verdict.  When asked how he felt about being selected as a juror, R.H. stated, "Well, any time you are selected puts an imposition and disruption in your life, but I tend to do my part."  He also stated that he would be able to give appellant a fair trial.

After the first 18 prospective jurors were questioned by the court and counsel, defense counsel challenged several jurors for cause.  The attorneys then exercised their peremptory challenges.  The prosecutor passed.  The defense excused a juror.  The prosecutor passed for a second time.  Defense counsel excused a juror.  The prosecutor excused a juror, and defense counsel excused another juror.  The prosecutor passed for a third time.  Defense counsel excused a juror.  When R.H. was seated, the prosecutor excused R.H.  After the prosecutor excused R.H, defense counsel made a <u>Batson/Wheeler</u> motion.  He argued that R.H., who was excused by the prosecutor, "was [an] African-American male."  The court concluded that counsel had made a prima facie case and noted that the burden "shifts to the District Attorney to show race neutral justifications or explanations."

In response, the prosecutor stated, "My decision to kick [R.H.] and not allow him to sit on the jury was based upon the number of previous marriages that he's had and three in total.  He's unique in this entire venire in terms of that, and I thought that that may cause his own past experience to spill over into this trial in a way that he would identify more with the defendant than is proper.  He also indicated in one of his questions in his questionnaire -- I believe [it's] number 25 -- his feeling that the system is overcrowded, and that there's room for improvement.  And I thought that he also expressed concern, but tried to dissuade me[,] that it was a problem with respect to the financial ability.  That's a common statement, but that was my secondary reason that I thought he had concerns with the way the criminal justice system worked.  I recognized that and balanced that against his previous commitment to this process in which he served on three other previous juries and stated that he was a willing participant in this, but in the end I decided that I could not allow somebody who had had so many failed marriages to sit in this case where we had a failed marriage at issue on this case."

United States District Court
For the Northern District of California

> Defense counsel disagreed with the prosecutor's proffered justification and noted, "Obviously, the Court has a lot of discretion here, but given the panel that I see behind me, and given the chances of getting another African-American male on this panel, I think [it] is going to be very difficult to get a juror of [appellant's] . . . peer group."[7]  After hearing argument from defense counsel, the court denied the motion, stating, "I will find that the District Attorney's reasons are race neutral, and I accept them as honest; that those are his reasons for exercising his peremptory challenge against [R.H.]."

Cal. Ct. App. Opinion, ¶. 2-4 (footnote renumbered).

Driver claims that the Prosecutor's reasons for raising a peremptory challenge against R.H., an African-American prospective juror, was a pretext for race discrimination, in support of his Equal Protection claim under the Batson standard.

The Equal Protection Clause of the Constitution forbids challenging potential jurors solely on account of their race.  See Batson, 476 U.S. at 89; see also J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 130 (1994).  A party may raise an equal protection claim on behalf of a juror regardless of whether the party and the excluded juror share the same race.  See Powers v. Ohio, 499 U.S. 400, 406 (1991).

As part of its Batson analysis, the Supreme Court applies a three-step process for evaluating claims involving a prosecutor using peremptory challenges in an allegedly unconstitutional manner.  See Hernandez v. New York, 500 U.S. 352, 358 (1991); Batson, 476 U.S. at 96-97.  "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race."  Hernandez, 500 U.S. at 358.

To establish a prima facie case, Driver must show that (1) the prospective juror who was removed is a member of a cognizable group, (2) the prosecutor exercised a peremptory challenge to remove the juror, and (3) "the facts and any other relevant circumstances raise an inference" that the challenge was motivated by race.  Cooperwood v. Cambra, 245 F.3d 1042, 1046 (9th Cir. 2001).  However, if the trial court ruled on the ultimate question of intentional discrimination, a federal habeas court does not need to dwell on the first step because "the preliminary issue of whether the defendant ha[s] made a prima facie showing becomes moot."  Hernandez, 500 U.S. at 359.  "Second, if the requisite showing has been made, the burden shifts

---

[7] Three members of the jury were African-American.

United States District Court
For the Northern District of California

to the prosecutor to articulate a race-neutral explanation for striking the jurors in question." Id. at 358-59. The prosecutor cannot meet this burden through "mere general assertions," but must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result." Batson, 476 U.S. at 94. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Id. at 98; see also Hernandez, 500 U.S. at 359; Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000).

To fulfill its duty, the trial court must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel. See Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004); see also Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir. 2003). The trial court must proceed to this third step and determine whether there was intentional discrimination, even in the absence of further request from counsel. United States v. Alanis, 335 F.3d 965, 968 (9th Cir. 2003).

In evaluating the prosecutor's explanation of race neutrality, proof of discriminatory intent or purpose, and not merely disproportionate impact, is required to show a violation of the Equal Protection Clause. See Hernandez, 500 U.S. at 355-62 (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony). In addition, the findings of the trial court on the issue of discriminatory intent are entitled to "great deference" because "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" Id. at 364-65 (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)). Therefore, the trial court's conclusion is not to be reversed unless it is found to be "clearly erroneous." Hernandez, 500 U.S. at 369.

The findings of the trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review. See Purkett v. Elem, 514 U.S. 765, 769 (1995). So are the findings of the state appellate court.[8] See Mitleider, 391 F.3d

---

[8] The Ninth Circuit has opined in dicta that, unlike a trial court, a court of appeal is not in an ideal position to conduct a step-three evaluation. Lewis, 321 F.3d at 832. But even Lewis acknowledged that a court of appeal is in a good position to use the trial court's findings and the evidence on the record to evaluate the support on the record for the prosecutor's reasons and credibility, and to compare the struck and empaneled jurors. Id.; accord Mitleider, 391 F.3d at 1050 (affording presumption of correctness to state appellate court's finding that prosecutor's

United States District Court
For the Northern District of California

at 1050; Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004).  But a federal district court is not bound by any state court fact findings when such findings are either unsupported in the record or refuted by it.  See Johnson v. Vasquez, 3 F.3d 1327, 1331 (9th Cir. 1993) (reversing and remanding denial of writ because there was insufficient support in record that black juror was removed for other than racial reasons), cert. denied, 511 U.S. 1085 (1994); see, e.g., McClain v. Prunty, 217 F.3d 1209, 1221-23 (9th Cir. 2000) (trial court's decision that defendant did not meet his burden of proving intentional discrimination was based on an unreasonable determination of the facts in light of evidence at trial that showed the prosecutor's stated reasons for striking jurors were factually wrong, pretextual, or nonsensical).

The state appellate court rejected Driver's Batson/Wheeler claim as follows:

> Appellant, an African-American, contends the trial court erred in denying his Batson/Wheeler motion because: (1) the prosecutor's "purported reasons" for challenging R.H. were pretextual; and (2) the court failed to "make a 'sincere and reasoned attempt to evaluate' them."  Both the state and federal Constitutions forbid a prosecutor from excluding prospective jurors from the jury for a purposefully racially discriminatory purpose. (Batson, supra, 476 U.S. at ¶. 95-96; Wheeler, supra, 22 Cal.3d at ¶. 276-277.) In other words, the prosecution may not exercise peremptory challenges solely on the basis of presumed group bias, i.e., on the presumption "jurors are biased merely because they are members of an identifiable group distinguished on racial . . . or similar grounds." (Wheeler, supra, 22 Cal.3d at p. 276.)

> The following procedure applies to a Batson/Wheeler challenge to a peremptory strike: "'"First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'"'" (People v. Zambrano (2007) 41 Cal.4th 1082, 1104, overruled on another point in People v. Doolin (2009) 45 Cal.4th 390, 421, fn. 5.)

> "'We review the trial court's ruling on purposeful racial discrimination for substantial evidence.  [Citation.]  It is presumed that the prosecutor uses peremptory challenges in a constitutional manner.'" (Zambrano, supra, 41 Cal.4th at p. 1104; People v. Turner (1994) 8 Cal.4th 137, 165, overruled on different grounds in People v. Griffin (2004) 33 Cal.4th 536, 555, fn. 5 ["There is a presumption that a prosecutor uses his or her peremptory challenges in a constitutional manner"].)  "Since the trial judge's findings [on this issue] largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference" (Batson, supra, 476 U.S. at p. 98, fn. 21),

proffered reasons and actual motives for challenging the juror were race-neutral).

United States District Court
For the Northern District of California

"recogniz[ing] that such a ruling 'requires trial judges to make difficult and often close judgments.'"  (<u>Wheeler</u>, <u>supra</u>, 22 Cal.3d at p. 281.)  Nonetheless, the "exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal."  (<u>People v. Silva</u> (2001) 25 Cal.4th 345, 386.)

"The proper focus of a <u>Batson/Wheeler</u> inquiry, of course, is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons.  [Citation.]  So, for example, if a prosecutor believes a prospective juror with long, unkempt hair, a mustache, and a beard would not make a good juror in the case, a peremptory challenge to the prospective juror, sincerely exercised on that basis, will constitute an entirely valid and nondiscriminatory reason for exercising the challenge.  [Citation.]  It matters not that another prosecutor would have chosen to leave the prospective juror on the jury.  Nor does it matter that the prosecutor, by peremptorily excusing men with long unkempt hair and facial hair on the basis that they are specifically biased against him or against the People's case or witnesses, may be passing over any number of conscientious and fully qualified potential jurors.  All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.  '[A] "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.  [Citations.].'  [Citation.]"  (<u>People v. Reynoso</u> (2003) 31 Cal.4th 903, 924.)

Here, the prosecutor stated two reasons for challenging R.H.  First, he explained that R.H.'s marital history (R.H. had been divorced three times, more than any other potential juror) "may cause his own past experience to spill over into this trial in a way that he would identify more with the defendant than is proper."  The prosecutor also noted that he "decided that [he] could not allow somebody who had so many failed marriages to sit in this case where we had a failed marriage at issue."[9]  Second, the prosecutor stated that he was concerned about R.H.'s feelings on the criminal justice system -- that there was room for improvement and that a "better defense can be waged if you are financially able."

We cannot conclude that these reasons were implausible.  (See <u>Reynoso</u>, <u>supra</u>, 31 Cal.4th at p. 916 ["[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination"].)  It is well-settled that a "prosecutor is entitled to exercise a certain number of peremptory challenges simply on a suspicion that the juror will be unfavorable to his or her cause. . . ."  (<u>People v. Pinholster</u> (1992) 1 Cal.4th 865, 914.)[10]  "Jurors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias.  [Citation.]"  (<u>Turner</u>, <u>supra</u>, 8 Cal.4th at p. 165.)  And "[n]owhere does <u>Wheeler</u> or <u>Batson</u> say that trivial reasons are invalid."  (<u>People v. Johnson</u> (1989) 47 Cal.3d 1194, 1218.)

---

[9] Appellant takes issue with the prosecutor's characterizations of R.H.'s three marriages as "failed."  We are unable to see how a marriage ending in divorce is not "failed."  Appellant also disagrees with the prosecutor's characterization of this case as concerning "a failed marriage," but the record amply supports the characterization: appellant was separated from his wife when he kidnapped her, injured her, and threatened to kill her.  At trial, Wright testified that she planned to divorce appellant.

[10] <u>People v. Pinholster</u>, 1 Cal. 4th 865, 914 (1992), <u>overruled on other grounds in People v. Williams</u>, 49 Cal. 4th 405, 459 (2010).

It is not implausible that the prosecutor would harbor an honest concern that someone who had been married -- and divorced -- three times might be unable to assess the evidence impartially in a case concerning a dispute between husband and wife.  <u>People v. Hamilton</u> (2009) 45 Cal.4th 863 is on point.  In that case, the California Supreme Court held, among other things, that the trial court did not abuse its discretion in concluding that the prosecutor's reasons for excluding prospective African-American jurors were race-neutral.  The prosecutor excused one prospective juror because she "was young and single"; the prosecutor explained "that he did not want unsophisticated, immature jurors, since he thought the case would 'definitely appeal more to married people and particularly married people with children.'"  (<u>Id.</u> at p. 903.)  The California Supreme Court also rejected the defendant's assertion that the trial court failed to carefully assess the prosecutor's stated reasons for challenging the African-American prospective jurors.  (<u>Id.</u> at ¶. 906-907.)

Nor is the prosecutor's second reason for challenging R.H. implausible.  R.H. stated that a defendant could get a better defense if he or she were "financially able."  It is not implausible for the prosecutor to perceive that R.H. may have sympathy for appellant, who was unemployed and unable to hire an attorney of his choosing.  The trial court concluded that the prosecutor's reasons for excluding R.H. were "race-neutral" and "honest."  Deferring, as we must, to the trial court's determination, we conclude substantial evidence supports the trial court's finding that the prosecutor's peremptory challenge of R.H. was not motivated by discriminatory intent.  (<u>People v. Cruz</u> (2008) 44 Cal.4th 636, 661.)

Appellant's reliance on comparative juror analysis does not alter our conclusion.  (<u>Cruz</u>, <u>supra</u>, 44 Cal.4th at p. 661.)  Consistent with the California Supreme Court's holding in <u>People v. Lenix</u> (2008) 44 Cal.4th 602, 622, "we have undertaken comparative juror analysis of the jury questionnaire and voir dire responses of other prospective jurors identified by [appellant] as supportive of his claim that [R.H.] was excused with discriminatory intent."  (<u>Cruz</u>, <u>supra</u>, 44 Cal.4th at p. 659, fn. omitted.)  In conducting comparative juror analysis, we bear in mind that "the question is not whether we as a reviewing court find the challenged prospective jurors similarly situated, or not, to those who were accepted, but whether the record shows that the party making the peremptory challenges honestly believed them not to be similarly situated in legitimate respects."  (<u>People v. Huggins</u> (2006) 38 Cal.4th 175, 233.)  Appellant contends that the prosecutor accepted five jurors, "four with amicable divorces, one with a contentious divorce" which demonstrates that the prosecutor's challenge of R.H. on the grounds of his "'prior failed marriages' was pretextual."  We disagree.  The prosecutor noted that R.H.'s three divorces made him "unique in this entire venire."  As a result, the record shows that the prosecutor "honestly believed" that the R.H. was not similarly situated to the rest of the jurors in the venire.  (<u>Id.</u> at p. 233.)

Appellant also faults the trial court for failing to "make a 'sincere and reasoned attempt to evaluate'" the prosecutor's stated reasons for challenging R.H.  Appellant seems to suggest the court was required to "question the prosecutor" and make "specific findings regarding [R.H.] himself, the prosecutor's lack of questioning [R.H.] about his prior marriages, . . . the connection between prior marriages and the issues in the case being tried, the relative significance of [R.H.]'s statements about the criminal justice system, etc."

Again, we disagree.  To be sure, the trial court "'must make "a sincere and

1   reasoned attempt to evaluate the prosecutor's explanation in light of the
2   circumstances of the case as then known, his knowledge of trial techniques, and
    his observations of the manner in which the prosecutor has examined members of
3   the venire and has exercised challenges for cause or peremptorily. . . ."
    [Citations.]' But in fulfilling that obligation, the trial court is not required to make
4   specific or detailed comments for the record to justify every instance in which a
    prosecutor's race-neutral reason for exercising a peremptory challenge is being
5   accepted by the court as genuine." (Reynoso, supra, 31 Cal.4th at p. 919.) "When
    the prosecutor's stated reasons are both inherently plausible and supported by the
6   record, the trial court need not question the prosecutor or make detailed findings."
    (Silva, supra, 25 Cal.4th at p. 386.)  It is only "when the prosecutor's stated
7   reasons are either unsupported by the record, inherently implausible, or both,
    [that] more is required of the trial court than a global finding that the reasons
8   appear sufficient." (Ibid.)  Here, the prosecutor's stated reasons for challenging
    R.H. were both plausible and supported by the record.  As a result, the trial court
9   did not err in declining to question the prosecutor or make "specific findings"
    regarding the prosecutor's reasons for challenging R.H.

10   Cal. Ct. App. Opinion, ¶. 7-12 (footnote 9 renumbered) (footnote 10 added).

11       As explained above, the state appellate court found no error in the trial court's decision

12   to deny Driver's Wheeler motion.  A review of the proffered justifications for the peremptory

13   challenge against the challenged juror establishes that the state appellate court's determination

14   of Driver's Batson/Wheeler claim was not contrary to, or an unreasonable application of, federal

15   law.  See 28 U.S.C. § 2254(d).

16       First, Driver argues that the Prosecutor's explanation for using a peremptory strike on

17   prospective juror R.H. was a pretext for racial discrimination. The Prosecutor gave two main

18   reasons for excusing R.H.: (1) R.H.'s experience of being divorced three times -- more than any

19   other potential juror -- "may cause his own past experience to spill over into this trial in a way

20   that he would identify more with the defendant than is proper," RT 83; and (2) R.H. had

21   "concerns with the way the criminal justice system worked," including that he had feelings that

22   there was "room for improvement" and that "it was a problem with respect to the financial

23   ability," RT 83-84.  The state appellate court noted that the trial court addressed the Prosecutor's

24   reasons for challenging R.H.  Cal. Ct. App. Opinion, p. 10.  The state appellate court further

25   noted that, upon considering the Prosecutor's challenge to R.H., the trial court completed the

26   third step of the Batson analysis by finding that the reasons given by the Prosecutor were "race

27   neutral." Id.  The trial court's conclusion that the Prosecutor's race-neutral reasons were genuine

28   and credible is entitled to deference because the trial court is in the best position to make

United States District Court
For the Northern District of California

credibility decisions.  Therefore, this court finds reasonable the state appellate court's rejection of Driver's claim that the Prosecutor's explanation for using a peremptory strike on prospective juror R.H. was a pretext for racial discrimination.

Second, Driver contends that the trial court failed to conduct an adequate evaluation of the Prosecutor's reasons for the strike.  The record shows that, after hearing the Prosecutor's reasons, the trial court indicated that there were, at that time, other African-Americans on the jury, and the Prosecutor pointed out that he did not use strikes against those potential jurors:

> THE COURT: And I should for the purposes of the record, that at the present time, I believe there are two African-American individuals seated on the present jury panel.  They are Juror No. 7 and Juror No. 10.

> [PROSECUTOR]: And I passed several times.  I have no issue with African-Americans sitting on this jury.

RT 84.  The trial court then heard argument from Driver's trial counsel before ruling on the motion as follows:

> THE COURT:  I will find that the District Attorney's reasons are race neutral, and I accept them as honest; that those are his reasons for exercising his peremptory challenge against [R.H.], so the motion is denied.

RT 86.

The trial court is obliged  to undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Batson, 476 U.S. at 93.  In the present case, the trial court made a credibility decision accepting the sincerity of the Prosecutor's reasons.  This suffices to establish that the court did "undertake" the necessary inquiry.  See Williams, 354 F.3d at 1106-08 (even if trial court made no explicit findings on credibility, state court could reasonably conclude that trial court made a sincere and reasoned attempt to evaluate prosecutor's credibility).  Therefore, Driver's claim that the trial court failed to "make a 'sincere and reasoned attempt to evaluate' [the Prosecutor's reasons]" is without merit.

Finally, comparative juror analysis -- i.e., determining whether non-challenged jurors possess any of the characteristics on which the prosecution challenged jurors in the protected group -- also may tend to prove discrimination at the third Batson step.  Snyder v. Louisiana, 552 U.S. 474, 483-84 (2008); Miller-El v. Dretke, 545 U.S. 231, 242-43 (2005) (Miller-El

II)(considering comparative juror analysis:  "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."); Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006).

In the present case only the state appellate court conducted a comparative juror analysis -- the trial court did not do so -- but that is irrelevant because a federal court looks only to the result reached in state court, not the reasoning the state court used in reaching that result.  See Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011).  Driver points to five jurors accepted by the Prosecutor who shared some characteristics with R.H., specifically "four with amicable divorces, one with a contentious divorce."  However, the state appellate court noted that the Prosecutor pointed out that R.H. had three divorces, which made him "unique in this entire venire."  Cal. App. Ct. Opinion, p. 11.  Thus, that court concluded that the record showed that the Prosecutor "honestly believed" that R.H. was "not similarly situated to the rest of the jurors on the venire."  Id. (citing People v. Huggins, 38 Cal. 4th 175, 233 (2006)).  Therefore, the state appellate court determined that comparative juror analysis did not provide any evidence that the strike was pretextual.  Accordingly, this court finds unavailing Driver's reliance on comparative juror analysis to support his claim that the Prosecutor's challenge of R.H. on the grounds that his "prior failed marriages" was pretextual.

In sum, in affirming the trial court's denial of Driver's Wheeler motion regarding prospective juror R.H., the state appellate court found that the reasons given by the Prosecutor were race neutral.  The state appellate court found that the trial court did not err is declining to make "special findings" regarding the Prosecutor's reasons for challenging R.H. because these reasons were "both plausible and supported by the record." Cal. App. Ct. Opinion, ¶. 12-13.  This court's review of the record confirms that the state courts' determination of Driver's Wheeler/Batson claim involving prospective juror R.H. was not contrary to, or an unreasonable application of, federal law.  See 28 U.S.C. § 2254(d).  The findings of the trial and state appellate court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review.  See Purkett, 514 U.S. at 769; Williams, 354 F.3d at 1108

15

**United States District Court**
For the Northern District of California

(affording presumption of correctness to state appellate court's finding that trial court's unclear/ambiguous ruling was proper application of third <u>Batson</u> step).  Driver has not provided any support to rebut the state courts' conclusion that his <u>Batson</u> claim as to prospective juror R.H. lacks merit.  <u>See</u> <u>Burks v. Borg</u>, 27 F.3d 1424, 1429 (9th Cir. 1994).  Taken at face value, the Prosecutor's reasons did not appear to be a pretext for racial discrimination because his stated reasons were supported by the record.  This court finds that the state appellate court reasonably concluded that the Prosecutor's peremptory challenge against R.H. was devoid of impermissible discriminatory motive.

Accordingly, Driver is not entitled to habeas relief as to his claim of the Prosecutor's illegal use of a peremptory challenge against prospective juror R.H.

II.    <u>Eighth Amendment claim</u>

Driver was sentenced, under California's Three Strikes law, to a sentence of 35-years-to-life in prison.  Driver claims that his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment.

A criminal sentence that is significantly disproportionate to the crime for which the defendant was convicted violates the Eighth Amendment.  <u>See</u> <u>Solem v. Helm</u>, 463 U.S. 277, 303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent felony violates the Eighth Amendment).  "Outside the context of capital punishment, <u>successful</u> challenges to the proportionality of particular sentences will be exceedingly rare."  <u>Id.</u> at 289-90 (brackets, citation and quotation marks omitted) (emphasis in original).  The Eighth Amendment prohibition on cruel and unusual punishment "does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."  <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1001 (1991) (quoting <u>Solem</u>, 463 U.S. at 288, 303) (Kennedy, J., concurring).[11]   Under this proportionality principle, the threshold

---

[11]   In analyzing this claim, the court must turn to clearly established federal law during the time of the relevant state court decision, which is the California Supreme Court's summary denial of Driver's petition for review on June 17, 2009.  <u>See</u> <u>Terry</u>, 529 U.S. at 412.  The Court "looks through" the unexplained California Supreme Court decision to the last reasoned state

**United States District Court**
For the Northern District of California

determination for the court is whether a petitioner's sentence is one of the rare cases in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. <u>United States v. Bland</u>, 961 F.2d 123, 129 (9th Cir.), <u>cert. denied</u>, 506 U.S. 858 (1992) (quoting <u>Harmelin</u>, 501 U.S. at 1005). Only if such an inference arises does the court proceed to compare a petitioner's sentence with sentences in the same and other jurisdictions. <u>See Harmelin</u>, 501 U.S. at 1004-05; <u>Bland</u>, 961 F.2d at 129.

The threshold for an "inference of gross disproportionality" is quite high. <u>See, e.g.</u>, <u>Harmelin</u>, 501 U.S. at 1005 (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality). In addition, a court may take into account the State's interest not only in punishing the offense of conviction, but also its interest "'in dealing in a harsher manner with those who [are] repeat[] criminal[s].'" <u>Bland</u>, 961 F.2d at 129 (quoting <u>Rummel v. Estelle</u>, 445 U.S. 263, 276 (1980)).

Here, the state appellate court rejected Driver's claim that his sentence of 35 years to life constituted cruel and unusual punishment as follows:

> Finally, appellant contends that his sentence -- 35 years to life in state prison -- constitutes cruel and unusual punishment within the meaning of the state and federal Constitutions. In response, the People argue that appellant forfeited this argument by failing to raise it in the trial court. We agree. If a defendant does not raise the issue of cruel and unusual punishment in the trial court, it is forfeited on appeal. (See <u>People v. Norman</u> (2003) 109 Cal.App.4th 221, 229-230 [defendant waived cruel and unusual punishment argument by failing to raise it below]; <u>People v. DeJesus</u> (1995) 38 Cal.App.4th 1, 27 [same].)

> We address the merits of appellant's argument notwithstanding his failure to raise the argument in the trial court. (See, e.g., <u>Norman</u>, <u>supra</u>, 109 Cal.App.4th at ¶. 229-230.) Appellant claims his sentence violates the federal prohibition on cruel and unusual punishment because it is disproportionate to "the gravity of his offenses." A punishment for a term of years violates the Eighth Amendment to the United States Constitution if it is an "'extreme sentence[ ] that [is] "grossly disproportionate" to the crime.'" (<u>Ewing v. California</u> (2003) 538 U.S. 11, 23

court decision -- the state appellate court's decision -- which was also issued in 2009. <u>See</u> <u>Shackleford v. Hubbard</u>, 234 F. 3d 1072, 1079 (9th Cir. 2000). This court notes that as of 2003, the Supreme Court has clarified its decision in <u>Harmelin</u> and confirmed that Justice Kennedy's proportionality principle is clearly established law. <u>See</u> <u>Ewing v. California</u>, 538 U.S. 11, 23 (2003) (applying the <u>Harmelin</u> standard); <u>United States v. Carr</u>, 56 F.3d 38, 39 (9th Cir. 1995); <u>see also</u> <u>United States v. Dubose</u>, 146 F.3d 1141, 1146-47 (9th Cir. 1998) (after <u>Harmelin</u>, the Eighth Amendment forbids "at most" only sentences that are "grossly disproportionate").

(Ewing) (plur. opn. of O'Connor, J.); Lockyer v. Andrade (2003) 538 U.S. 63, 72; Harmelin v. Michigan (1991) 501 U.S. 957, 1001 (Harmelin) (conc. opn. of Kennedy, J.).) In a noncapital case, "'successful challenges to the proportionality of particular sentences have been exceedingly rare.' [Citation.]" (Ewing, supra, 538 U.S. at p. 21.)

Kidnapping one's wife, willfully inflicting corporal injury on her, and threatening to kill her -- while armed with a screwdriver -- are serious crimes. Appellant concedes as much but tries, unsuccessfully, to minimize the seriousness of his offenses by arguing that the "injuries inflicted on Ms. Wright" were somehow not serious because she did not bother to see a doctor for treatment and by noting that appellant released Wright and might have allowed her to "run directly to a . . . patrol officer." We are not persuaded. Appellant's argument ignores the fact that his blows to her face and arms left scars and that appellant held Wright's shirt as she got out of the trunk. He did not allow her to run away – she broke free of his grasp and fled. Moreover, the severity of Wright's injuries is not the determinative factor.

He also compares his case to several others in an attempt to demonstrate that the punishment imposed here was grossly disproportionate to his crimes. He notes that in People v. Carmony (2005) 127 Cal.App.4th 1066, 1072-1077, the court concluded that a 25-year-to-life sentence was cruel and unusual where the current offense – failure to register as a sex offender – was a "harmless technical violation of a regulatory law." (Id. at p. 1072.) He also refers us to Banyard v. Duncan (C.D. Cal. 2004) 342 F.Supp.2d 865, 867-868, where a district court held that a 25-year-to-life sentence was grossly disproportionate where the predicate offense was possession of a small amount of rock cocaine. Finally, he relies on Ramirez v. Castro (9th Cir. 2004) 365 F.3d 755, where the Ninth Circuit determined that a 25-year-to-life sentence was grossly disproportionate to a crime of petty theft (id. at ¶. 756-758), and on Reyes v. Brown (9th Cir. 2005) 399 F.3d 964, 965, 968-970, where the Ninth Circuit held a similar sentence was grossly disproportionate to a crime of perjury. These cases are inapposite. Appellant was not convicted of a "harmless technical violation" or of a nonviolent offense. He was convicted of kidnapping his wife, hitting her, and of threatening to kill her. He tied her up, punched her, and locked her in the trunk of his car.

Appellant's claim that his sentence violates the California Constitution's prohibition on cruel and unusual punishment fares no better. A punishment may violate the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (In re Lynch (1972) 8 Cal.3d 410, 424, fn. omitted (Lynch).) To make that determination, we focus on the following three areas, any one of which can, by itself, establish disproportionality: (1) the nature of the offense and the offender; (2) a comparison with the punishment imposed for more serious crimes in the same jurisdiction; and (3) a comparison with the punishment imposed for the same offense in different jurisdictions. (Id. at ¶. 425-427.)

Regarding the first factor, we consider "the totality of the circumstances[.]" (People v. Dillon (1983) 34 Cal.3d 441, 479.) With respect to the nature of the offender, we consider his "individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (Ibid.) As we have already explained, the nature of the offenses was serious. As for the offender, appellant's probation report shows he has 16 prior convictions in California and several convictions in Illinois. The probation report also noted that appellant has a "lack of impulse control, [a] propensity toward violence and crime

**United States District Court**
For the Northern District of California

1  and [a] history of involvement in serious offenses."

2  Appellant contends that three of his previous convictions -- for arson in
3  violation of [California Penal Code, section 451] -- are 10 and 19 years old.  We
are not persuaded by his suggestion that the "remoteness" of these convictions for
4  arson should lessen the weight attached to his criminal history.  Appellant spent
a significant period of time since 1987 in custody -- approximately 17 years -- and
5  reoffended when he was released.  Our review of the offenses and the offender
does not compel us to find that appellant's sentence is grossly disproportionate to
6  the crime he has committed sufficient to shock the conscience and offend notions
of human dignity.  (Lynch, supra, 8 Cal.3d at p. 424.)

7  Next we consider the second factor: a comparison of the challenged penalty
8  with punishments for more serious offenses committed in the same jurisdiction.
Appellant contends his sentence is far greater than that imposed for "other, more
9  serious crimes" such as second degree murder, voluntary manslaughter, or rape.
But appellant ignores the fact that he is not being punished "merely on the basis
10  of his current offense but on the basis of his recidivist behavior." (Cf. People v.
Kinsey (1995) 40 Cal.App.4th 1621, 1630; People v. Cartwright (1995) 39
11  Cal.App.4th 1123, 1136-1137.) "'The basic fallacy of appellant's argument lies in
his failure to acknowledge that he "is not subject to a life sentence merely on the
12  basis of his current offense but on the basis of his recidivist behavior.  Recidivism
in the commission of multiple felonies poses a manifest danger to society[,]
13  justifying the imposition of longer sentences for subsequent offenses. [Citations.]"
[Citation.]'" (People v. Mantanez (2002) 98 Cal.App.4th 354, 366, quoting People
14  v. Stone (1999) 75 Cal.App.4th 707, 715.)

15  Finally, we compare the punishment imposed in this case with punishment
imposed for the same offense in other jurisdictions.  We note "[t]hat California's
16  punishment scheme is among the most extreme does not compel the conclusion
that it is unconstitutionally cruel or unusual.   This state constitutional
17  consideration does not require California to march in lockstep with other states in
fashioning a penal code.  It does not require 'conforming our Penal Code to the
18  "majority rule" or the least common denominator of penalties nationwide.'
[Citation.]  Otherwise, California could never take the toughest stance against
19  repeat offenders or any other type of criminal conduct." (People v. Martinez
(1999) 71 Cal.App.4th 1502, 1516.)

20  Appellant's sentence does not violate the proscription of cruel or unusual
21  punishment under either the federal or state Constitutions.

Cal. App. Ct. Opinion, ¶. 14-17.

22
23  Driver argues that he received an "extremely harsh" life sentence when measured against

24  the "triggering offenses" of "simple kidnap, making criminal threats, and corporal injury to a

25  spouse."  (Pet., Attach. at 47.)  While Driver admits that the aforementioned crimes he was

26  convicted of are "serious crimes," he argues that "the injuries inflicted on Ms. Wright were

27  insignificant . . . and that, apparently coming to his senses after several hours of rage, [he]

28  released [her] . . . ."  (Id.)

**United States District Court**
For the Northern District of California

1    In rejecting Driver's Eighth Amendment claim, the state appellate court reasoned that his

2    sentence of 35 years to life under California's Three Strikes law punishes not only his current

3    offenses, but also his recidivism.  <u>See</u> Cal. App. Ct. Opinion, p. 16 (citing <u>In re Lynch</u>,  8 Cal.

4    3d 410, 424 (1972) ("Appellant spent a significant period of time since 1987 in custody --

5    approximately 17 years -- and reoffended when he was released.  Our review of the offenses and

6    the offender does not compel us to find that appellant's sentence is grossly disproportionate to

7    the crime he has committed sufficient to shock the conscience and offend notions of human

8    dignity.")

9    When viewed in light of his criminal history and current felony convictions, the court

10   finds that Driverr's case is not that "rare case in which a threshold comparison of the crime

11   committed and the sentence imposed leads to an inference of gross disproportionality."

12   <u>Harmelin</u>, 501 U.S. at 1005.  Furthermore, the state appellate court reasonably applied the gross

13   disproportionality standard in rejecting Driver's Eighth Amendment claim.  The state appellate

14   court considered the current offenses of "[k]idnapping one's wife, inflicting corporal injury on

15   her, and threatening to kill her -- while armed with a screw driver" as well as his prior strikes for

16   arson, and reasonably concluded that his sentence was not unconstitutionally disproportionate

17   in light of his current offense and criminal history.  <u>See</u> Cal. App. Ct. Opinion, p. 16.  Therefore,

18   the state appellate court's rejection of Driver's claim was not contrary to or an unreasonable

19   application of clearly established federal law as determined by the Supreme Court.  <u>See</u> 28

20   U.S.C. § 2254(d); <u>see, e.g.</u>, <u>Rummel</u>, 445 U.S. at 284-85 (upholding life sentence of recidivist

21   convicted of fraudulent use of credit card of $80, passing forged check for $28.36 and obtaining

22   $120.75 under false pretenses); <u>Harmelin</u>, 501 U.S. at 996 (upholding sentence of life without

23   possibility of parole for first offense of possession of 672 grams of cocaine).

24   Accordingly, Driver is not entitled to habeas relief on his Eighth Amendment claim.

25

26   **CONCLUSION**

27   For the foregoing reasons, the petition for writ of habeas corpus is DENIED.  A certificate

28   of appealability will not issue.  Reasonable jurists would not "find the district court's assessment

of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). Driver may seek a certificate of appealability from the Ninth Circuit Court of Appeals.  The clerk shall enter judgment in favor of respondent, and close the file.

The court also directs the clerk to substitute Acting Warden Robert H. Trimble as the respondent in this action.  <u>See</u> <u>supra</u> note 6.

IT IS SO ORDERED.

DATED: November 21, 2011

_____
SUSAN ILLSTON
United States District Judge